STATE OF NORTH CAROLINA v. DONJUAN SMITH

No. COA09-1640

(Filed 17 August 2010)

**1. Constitutional Law— right to remain silent—prior statements—matters omitted**

The trial court did not err in a prosecution for the first-degree murder of a child by allowing the State to impeach defendant with his failure to provide certain information to the police before trial. This case involved impeachment with prior inconsistent statements given to officers rather than the use of post-arrest silence. The testimony at trial would have been naturally included in the earlier statements, if true.

STATE v. SMITH

[206 N.C. App. 404 (2010)]

## 2. Criminal Law— instructions—alibi—evidence not sufficient

The trial court did not err by not instructing the jury on alibi in a prosecution for the first-degree murder of a child where the evidence was not sufficient to warrant an instruction. Defendant's testimony did not show that he was at a particular place which would have made it impossible for him to have committed the crime.

Appeal by Defendant from judgment and commitment entered 27 February 2009 by Judge A. Leon Stanback in Superior Court, Wake County. Heard in the Court of Appeals 26 May 2010.

*Attorney General Roy Cooper, by Assistant Attorney General LaToya B. Powell, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for Defendant.*

STEPHENS, Judge.

### I. Procedural History

On 3 June 2008, a Wake County grand jury indicted Defendant for first-degree murder in the death of Charvis Dublin, Jr. ("Junior"), a two-year-old child. A superseding indictment for this offense was issued on 26 January 2009. Defendant was tried, non-capitally, during the 23 February 2009 Criminal Session of Wake County Superior Court, the Honorable A. Leon Stanback presiding. On 27 February 2009, a jury found Defendant guilty of first-degree murder under the felony murder rule. Judge Stanback sentenced Defendant to a term of life imprisonment without parole. From the judgment and commitment, Defendant appeals.

### II. Factual Background

At trial, the State's evidence tended to show the following: In March 2008, Dolisha Nicole Campbell ("Campbell") moved to Raleigh, North Carolina with her two children. Junior, her youngest child, was two years old at the time and described as "a happy, normal child who liked to play[,]" and "a sweet child."

In May 2008, Campbell was working as a traveling assistant manager for Cici's Pizza, which required her to rotate between different locations in Smithfield, Wilson, Cary, and Goldsboro, North Carolina. Campbell typically worked 15-hour shifts, which began at 9:00 a.m. and ended around midnight. Defendant, Campbell's boyfriend at the time, watched Junior during the day while Campbell went to work and Campbell's oldest child, Dezarea, went to school.

On the morning of 14 May 2008, Campbell gave Junior a bowl of cereal and some juice while Defendant walked Dezarea to the bus stop for school. Campbell then left for work around 8:15 or 8:30 a.m., leaving Junior in Defendant's care. During the time Campbell spent with Junior that morning, she did not notice anything unusual about his appearance or demeanor, and Junior had not recently been ill.

A few hours later, Campbell attempted to call Defendant twice on his cell phone between 10:00 a.m. and noon, but received no answer. Defendant answered the third call, and Campbell asked him, "[H]ow is everything?" Defendant responded that "everything's okay[,]" and told Campbell that Junior was asleep.

Between 2:00 and 3:00 p.m., Defendant called Campbell back and told her that Junior was not breathing. When she asked Defendant why Junior was not breathing, Defendant replied that Junior had vomited after eating some pizza and then stopped breathing. Thereafter, Defendant seemingly changed his mind, and told Campbell that Junior was breathing and that Junior was sleeping. Campbell asked Defendant if he was sure that Junior was okay, and he replied, "[Y]eah." Campbell asked Defendant if she needed to come home, and Defendant told her "no."

The next time Campbell spoke to Defendant was when he called Campbell around 7:00 p.m. Defendant told Campbell that he was at the neighbor's home and that Junior was "not breathing at all." Campbell became hysterical, started yelling, "[W]hat happened, what happened[,]" and asked Defendant whether he had called for an ambulance. Defendant stated that he had called 911. Campbell hung up the phone and drove straight to the hospital.

When Campbell first saw Junior, he was lying on a hospital bed wearing only a diaper, and "[h]is skin looked yellowish. He looked like he was asleep. He just looked stiff like he wasn't moving." A nurse told Campbell that the hospital had done everything they could and that it did not look like Junior was "coming back." When Campbell asked the nurse what she meant by that, the nurse told her that Junior was dead.

While at the hospital, Defendant initially told Campbell that all he did was give Junior some Cici's pizza and then Junior threw up. Campbell replied, "[S]o my son died because he ate Cici's pizza?" Campbell then asked Defendant whether Junior had choked. Defendant answered "no" and told Campbell, "He just threw up, I laid

him down and he just stopped breathing." When Campbell pressed Defendant for answers about how Junior stopped breathing, Defendant stated that Junior had thrown up, but this time, he added that he gave Junior a bath and that Junior had drowned. Defendant next told Campbell that he sat Junior on the toilet and that Junior had "passed out." Beyond these explanations, Defendant never indicated to Campbell that anything else had happened to Junior.

Taneka Shontel Hinton ("Hinton"), Campbell's next door neighbor and friend, testified that Defendant would often bring Campbell's children to Hinton's apartment to play with Hinton's two children. On 14 May 2008, between 9:00 and 10:00 a.m., Defendant took Junior to Hinton's apartment to play with Hinton's son. Hinton did not notice anything unusual about Junior's appearance and did not see any bruises on his face or arms. Junior appeared "normal" that morning and was quiet, as usual. Defendant and Junior stayed at Hinton's apartment for about an hour and left sometime before 11:00 a.m.

At approximately 6:30 p.m., Defendant returned to Hinton's apartment, carrying Junior in his arms. Ernestine Hinton ("Ernestine"), Hinton's sister, and Connie Hinton ("Connie"), Hinton's mother, answered the door, and both thought Junior was asleep. Defendant asked if he could lay Junior down on the bed, then took Junior straight to the back bedroom. Defendant called Campbell from the bedroom. Ernestine and Connie overheard Defendant telling Campbell that Junior needed to go to the hospital because he was sick. When Defendant hung up the phone, Defendant asked Ernestine to come look at Junior because "he wasn't acting right." When Ernestine went into the bedroom, Junior was lying on the bed, and "[h]is eyes [were] halfway open and his mouth was open a little bit." Ernestine knew immediately that Junior was dead because "he was lying there motionless[.]" Ernestine picked up Junior's arm to check for a pulse "and it was real limp" and "he was cold[.]" She lifted up Junior's shirt to check for movement, and "[h]is chest looked like it was pressed in or something[.]" Ernestine called Connie into the room, and Connie also noticed that Junior "didn't look right." Connie touched Junior's face and hands, which were "cold" and "stiff." Connie told Ernestine to call 911. Defendant walked out of the room and said, "[O]h, God, how am I going to tell this girl that her baby's dead?"

Ernestine called 911 and gave the phone to Defendant. Defendant told the 911 operator that he had given Junior some Cici's pizza and

something to drink, which made Junior sick. Defendant then gave the phone to Connie, who attempted to perform CPR based on instructions from the 911 operator. When Connie lifted up Junior's shirt to perform CPR, she saw bruises on his chest that "looked like [a] fist print." Connie was hesitant to touch Junior because of the bruises, but the 911 operator told her to go ahead with the CPR. As she administered CPR, Connie heard something that sounded like water moving around in Junior's chest.

While Connie was administering CPR, Defendant was pacing around the room, putting his hands on his head, and acting nervous. Ernestine believed that Defendant was "putting on" and "wasn't acting like most people would act if they knew that a child that they cared about or really loved wasn't breathing[.]" One minute, Defendant would appear to be calm and the next minute, he would "try and make himself cry." Connie also believed Defendant was "too calm[,]" and was wondering why Defendant did not try to help her by holding the phone. At one point while she was administering CPR, Connie heard Defendant say, "I got to get that CD. That's slamming[,]" referring to a music video that was playing on the television in the living room.

Defendant answered the door and directed the emergency medical technicians with the Raleigh Fire Department to the back bedroom. The firefighters had received the 911 dispatch at 7:24 p.m. and were the first to arrive on the scene. They immediately checked Junior's vital signs and determined he had no pulse and was not breathing. They continued to administer CPR and attempted to use a defibrillator unit, but "[t]he machine did not detect any shockable rhythm." When EMS arrived, the firefighters lifted Junior's body and carried him outside to the ambulance and placed him on a stretcher. As they lifted Junior, "brownish dark fluid" began to run out of his mouth and nose. While paramedics worked on Junior, Defendant told one of the firefighters that Junior became sick after eating pizza and that Junior fell asleep after Defendant cleaned him up. Defendant was very "nervous" and "inquisitive" and wanted to know what was happening in the ambulance. Defendant told bystanders in the parking lot that "he didn't do anything wrong[,]" and that "these people [are] going to think that I did it."

Although Junior still had no pulse or heartbeat and was not breathing, the paramedics continued CPR on the way to Wake Medical Center ("WakeMed") in Raleigh, which is normal protocol for

a child under the age of eighteen. Junior arrived at WakeMed around 7:30 p.m., still cold and not breathing, but the medical staff at the hospital continued CPR because he was a child. After about 30 or 45 minutes, Junior was pronounced dead. The nurses who administered CPR to Junior noticed bruises on both sides of his ribs, which they reported to Child Protective Services, as they are required to do by law.

After speaking to the hospital staff, Detectives Zeke Morse and K.A. Copeland (collectively, "the detectives"), with the Raleigh Police Department, asked whether there was anything Defendant wanted to say about possibly hurting the child, leaving the child unattended, or the child having hurt himself by mistake. They then informed Defendant that the neighbors believed Junior was already dead when Defendant brought Junior to their apartment and that an autopsy would determine the specific cause of his death. At this point, Defendant became emotional and told the detectives that he believed Junior had drowned. Defendant stated that after Junior threw up, he put Junior in the bathtub and then left him unattended for about ten minutes while he talked to a friend on his phone. When he returned, Junior was lying face down in the water and was unresponsive. Defendant then laid Junior on the bed, and Junior began making a "raspy noise[,]" while trying to breathe. Junior's eyes were open but he was not blinking. At this point, Defendant knew Junior was dead, and he panicked. Defendant got Junior dressed and took him to the neighbor's home. Defendant initially told the neighbors that Junior was asleep, but then asked them to look at Junior because he did not look right. Upon looking at Junior, the neighbors discovered he was dead.

At 12:50 a.m., Defendant was placed under arrest and advised of his *Miranda* rights, which he waived. At 1:21 a.m., Detective Copeland re-entered the interview room and asked Defendant "if he had done anything to the child to cause his death." Defendant repeatedly stated, "I did not hit, kick or hurt [Junior] in any way that would have caused his death." After the interview, Defendant was transported to the Wake County jail. The next day, on 15 May 2008, Detective Morse and Detective William Gill retrieved Defendant from the Jail and transported him back to the police station, where he was charged with first-degree murder based upon information obtained from the medical examiner's office.

Dr. John D. Butts, Chief Medical Examiner for the State of North Carolina, performed an autopsy on Junior on 15 May 2008. Dr. Butts

observed several "dime[-sized]" bruises located in clusters around Junior's body. A significant number of these bruises were located in the left upper chest area, and additional clusters were on the left side of his back and on each side of his lower chest and upper abdominal area. There was also minor bruising on the inside of Junior's thighs. Dr. Butts explained that while some bruising can be caused by CPR, it is not normally as extensive as the bruising he observed on Junior. In addition, "an individual being resuscitated has lost their blood pressure so they don't move blood." Thus, "[i]t's very unusual to see any kind of bruising from CPR in someone whose heart has already stopped unless they get the heart going again."

The internal examination revealed severe injuries to Junior's internal organs and "free blood" within the abdominal cavity. A large hemorrhage or blood clot was present over the right surface of the liver and there were tears on the inside of the liver, which caused the bleeding in the abdominal cavity. Additional hemorrhaging was present in some of the structures that support the bowels and intestines, in tissues along the back of the abdomen, and along the adrenal gland on top of the kidneys. There were bruises on the inner surfaces of both sides of the scalp toward the back of Junior's head and bleeding over the surface of his brain. The areas of bruising on the scalp were indicative of blows to the head that had ruptured blood vessels.

Dr. Butts determined from this autopsy that Junior suffered trauma to his chest, abdomen, and head and that the injuries to the abdomen most likely killed him. Dr. Butts stated that in his medical opinion, these injuries were neither self-inflicted nor accidental. Only "very solid types of blows[,]" with enough pressure to rupture organs, could have caused Junior's injuries. The bruises also appeared to be fresh and had likely been inflicted within the past several hours, as opposed to days. While Dr. Butts could not determine the precise time of Junior's death, the damage to the liver suggested that he lived for some time following these injuries, possibly for a few hours.

Defendant testified at trial and presented a different account of the events leading up to Junior's death. Defendant testified that on the morning of 14 May 2008, he fed Junior two slices of pizza and a garlic roll, which Junior ate fairly quickly. Defendant then gave Junior some ice water, which Junior drank, and thereafter, began to spit up and soil his diaper. Defendant cleaned him up, took off the diaper, and started filling the bathtub with water. He then noticed that Junior was defecating on the couch, so he got some wipes and carried Junior

into the bathroom. Defendant put Junior in the bathtub, and at 5:00 p.m., Defendant's cell phone rang, which alerted him that his friend from New York was outside. The person waiting outside was a fellow gang member, known only to Defendant as "Eric," who was also Defendant's drug supplier.

Defendant went outside and gave Eric $500 in cash to pay for one pound of marijuana, leaving Junior alone in the bathtub. Defendant testified that he sold marijuana because he was a member of the "Eastside Bounty Hunter" sect of the Bloods and had to put a certain amount of money into a "kitty" each week. Defendant remained outside with Eric for 20 minutes. When he returned to the apartment, he found Junior face down in the bathtub. He picked Junior up and wiped him down with a towel but Junior did not respond. Defendant then dressed Junior and took Junior to Hinton's apartment. At that time, Junior felt like a "noodle" and his eyes were half-way shut. Defendant took Junior into the bedroom, called Campbell at work, and told her that Junior was not responding, and Campbell became hysterical. Defendant hung up the phone and called Ernestine into the room, and upon seeing Junior, she immediately called for her mother, who told her to call 911.

While Connie administered CPR, Defendant went into the living room and began pacing back and forth and reconstructing what happened in his mind. Defendant denied that he had looked at or commented about a music video on the television. Defendant heard water in Junior's chest while Connie was administering CPR, and he believed Junior had drowned. Defendant testified that he did not tell the police about his meeting with Eric because he did not want police to know that he was a gang member or that he sold drugs and because Campbell had warned him not to leave the kids alone. He denied that he had hit, kicked, punched, or otherwise hurt Junior in any way.

Defendant also testified that Campbell's apartment was located in the territory of the "Crips" gang, which is a rival gang of the Bloods. Defendant made it publicly known that he was a Blood and claimed that some guys had previously threatened him. On rebuttal for the State, Officer Rico Boyce of the Raleigh Police Department testified that he worked as a gang officer on the gang suppression unit for three years and that he was familiar with the Bloods and Crips territories in Raleigh. Officer Boyce testified that Campbell's apartment complex was located in an area heavily controlled by the Bloods. To his knowledge, the Crips did not have any territories near the apartment.

STATE v. SMITH

[206 N.C. App. 404 (2010)]

## III. Discussion

[1] Defendant argues the trial court erred by allowing the State to impeach Defendant with his failure to provide information about his alleged meeting with Eric to the police or the prosecution before trial. Specifically, Defendant contends this form of impeachment violated Defendant's constitutional rights to be free from self-incrimination and to due process of law. We disagree.

"It is well-established under both the United States and the North Carolina Constitutions that post-*Miranda* silence may generally not be used to impeach the defendant on cross-examination." *State v. Fair*, 354 N.C. 131, 156, 557 S.E.2d 500, 518 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002); *accord Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98 (1976) ("[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial[.]"). However, "[w]hen the defendant chooses to speak *voluntarily* after receiving *Miranda* warnings, . . . the rule in *Doyle* is not triggered." *Fair*, 354 N.C. at 156, 557 S.E.2d at 518.

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Anderson v. Charles*, 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226 (1980) (emphasis added).

In *Doyle*, Doyle was arrested and charged with selling "marihuana to a local narcotics bureau informant." *Doyle*, 426 U.S. at 611, 49 L. Ed. 2d at 94. Doyle, unaware that narcotics agents were following him, was scheduled to meet the informant and sell him "marihuana." *Id.* at 612, 49 L. Ed. 2d at 94. The narcotics agents were unable to see the actual transaction take place between Doyle and the informant. *Id.* After the alleged transaction, a narcotics agent arrested Doyle, read Doyle his *Miranda* rights, and searched Doyle's vehicle with a warrant. *Id.* Doyle never made a statement to the police or the prosecution after his arrest or before his trial. *Id.* At trial, Doyle took the stand and admitted all but the most crucial element of the State's case, "who was selling marihuana to whom." *Id.* at 612-13, 49 L. Ed. 2d at 95. According to Doyle, the informant had framed him. *Id.* at

STATE v. SMITH

[206 N.C. App. 404 (2010)]

613, 49 L. Ed. 2d at 95. Doyle testified that the real arrangement was for the informant to sell Doyle the marijuana, but at the last minute Doyle changed his mind and tried to back out of the deal. *Id.* Doyle stated that the informant got angry and threw money into Doyle's car to frame Doyle for selling marijuana to the informant. *Id.* "[Doyle's] explanation of the events presented some difficulty for the prosecution, as it was not entirely implausible and there was little if any direct evidence to contradict [Doyle's story]." *Id.* On cross-examination, the prosecutor asked Doyle why he had not told his story to the narcotics agents sooner. *Id.* at 61314, 49 L. Ed. 2d at 95. The Supreme Court held "that the use for impeachment purposes of petitioner['s] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 49 L. Ed. 2d at 98 (emphasis added).

Unlike in *Doyle*, the present matter does not involve the use of a defendant's post-arrest silence for impeachment. If a defendant chooses not to remain silent, then

> [c]ross-examination can properly be made into why, if the defendant's trial testimony regarding his alibi is true, he did not include in his earlier statement the relevant information disclosed at trial. Conversely, cross-examination on prior inconsistent statements is improper if it is intended to elicit meaning from, or comment on, the defendant's exercise of his or her right to remain silent.

*Fair*, 354 N.C. at 156, 557 S.E.2d at 519 (internal citations omitted).

"[The] next step in that analysis is to determine whether the admission of the challenged testimony is consistent with the rules of evidence regarding prior inconsistent statements." *Id.* at 157, 557 S.E.2d at 519. To be considered a prior inconsistent statement under the North Carolina Rules of Evidence, the prior statement must have eliminated "a material circumstance presently testified to which would have been natural to mention in the prior statement." *Id.* Thus, a defendant's prior inconsistent statement is properly used to impeach his trial testimony when it would have been natural for defendant to include the information revealed at trial in his prior statement. *Id.* at 158-59, 557 S.E.2d at 520.

Defendant in the instant case voluntarily spoke to law enforcement officers and offered varying explanations for how Junior came to stop breathing. Defendant first told police officers that Junior had thrown up after eating pizza and stopped breathing after falling

asleep. Defendant later told officers that Junior had drowned when Defendant left him unattended while Defendant was talking on the phone. At trial, Defendant mentioned for the first time a meeting with a fellow gang member named Eric. Thus, while *Doyle* involved the use of the defendant's post-arrest silence for impeachment, the case *sub judice* involves the use of Defendant's prior inconsistent statements, which is permissible.

Defendant testified on direct examination that he left Junior alone and unattended in a bathtub while Defendant conducted business outside the apartment with his marijuana supplier, a man he knew only as Eric. On cross-examination, the following exchange took place:

[Prosecutor]: Who is this Eric person that you told us about yesterday? Who is he to you?

[Defendant]: One of my blood friends slash connect. It is who I purchase my marijuana from.

. . . .

[Prosecutor]: You talked to Detective Morse and Detective Copeland for almost three hours the day that Junior died; correct?

[Defendant]: Yes, ma'am.

[Prosecutor]: And you never mentioned anyone named Eric to them, did you?

[Defendant]: No, ma'am.

[Prosecutor]: Not even when they came back and actually charged you with the death of that child did you mention anyone named Eric[?]

[Defense Counsel]: Objection. I need to be heard on that, your [H]onor.

Outside the presence of the jury, defense counsel stated that it was unclear as to which "charge" the prosecutor was referring. The prosecutor responded that she was specifically referring to statements Defendant made when he spoke to Detectives Morse and Copeland after waiving his rights. Defendant's objection was overruled. The State's cross-examination of Defendant proceeded as follows:

**STATE v. SMITH**

[206 N.C. App. 404 (2010)]

[Prosecutor]: When you were speaking to Detective Morse and Detective Copeland when they came back into that room and charged you with the death of Junior, you didn't tell them anything about Eric at that time, did you?

[Defense Counsel]: No objection to that question.

[Defendant]: No, ma'am.

[Prosecutor]: And it's been nine months since this occurred; is that correct?

[Defendant]: Yes, ma'am.

[Prosecutor]: And in that nine months you have never told anyone.

[Defense Counsel]: Objection, your Honor.

The Court: Overruled.

[Prosecutor]: You have never told anyone about Eric until yesterday; is that correct?

[Defense Counsel]: Objection, your Honor. The defendant's not required to speak to anyone, your Honor.

The Court: Overruled.

[Prosecutor]: Did you ever contact the DA's office?

[Defense Counsel]: Objection, your Honor. The defendant doesn't have to talk to the DA's office, your Honor.

[Defendant]: No.

[Prosecutor]: So no one had any way to know that there was an Eric they needed to investigate until yesterday.

[Defense Counsel]: Objection. Including Fifth Amendment grounds, your Honor, and Sixth Amendment grounds.

The Court: Overruled.

The clear implication from the prosecutor's questions is "why, if the defendant's trial testimony regarding his alibi is true, he did not include in his earlier statement the relevant information disclosed at trial." *Fair*, 354 N.C. at 156, 557 S.E.2d at 519. Defendant's alleged meeting with Eric while Junior was allegedly in the bathtub would have been natural to include in Defendant's prior statements made to law enforcement officers. *See id.* Thus, Defendant's prior inconsis-

tent statements were properly used to impeach Defendant's testimony at trial. Defendant's argument is overruled.

*IV. Alibi*

**[2]** Defendant also argues that the trial court erred in denying Defendant's request to instruct the jury on alibi. We disagree.

Our Court reviews a trial court's decisions regarding jury instructions *de novo. State v. Osorio*, — N.C. App. —, —, 675 S.E.2d 144, 149 (2009). "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973). "[A] trial judge should not give instructions to the jury which are not supported by the evidence produced at the trial." *Id.* Moreover, "[w]here jury instructions are given without supporting evidence, a new trial is required." *State v. Porter*, 340 N.C. 320, 331, 457 S.E.2d 716, 721 (1995).

"An alibi is simply a defendant's plea or assertion that at the time the crime charged was perpetrated he was at another place and therefore could not have committed the crime." *State v. Hunt*, 283 N.C. 617, 619, 197 S.E.2d 513, 515 (1973). If a defendant has requested an alibi instruction and there is sufficient evidence to raise an issue as to alibi, the trial court must give the instruction. *Id.* at 622, 197 S.E.2d at 517; *accord State v. McLawhorn*, 270 N.C. 622, 630, 155 S.E.2d 198, 204 (1967) ("To entitle a defendant to a charge on alibi there must be evidence that at the time the crime was committed he was at a particular place which would make it *impossible for him* to have committed the crime."). Moreover, "a defendant's mere denial that he was at the place when the crime was committed is insufficient to justify the giving of an instruction on alibi." *State v. Green*, 268 N.C. 690, 692, 151 S.E.2d 606, 608 (1996). "If the evidence does not reasonably exclude the possibility of the presence of defendant at the scene of the alleged crime, it is not error to fail to instruct the jury on the law of alibi." *Id.*

In *Green*, the defendant was convicted of assault with a deadly weapon. *Id.* at 691, 151 S.E.2d at 607. At trial, the victim testified that the defendant had cut her across the face with a knife. *Id.* The defendant, the sole witness for the defense, testified that he did not cut the victim and did not see the victim on the day she was cut. *Id.* Our Supreme Court found no error in the trial court's decision not to

charge the jury on alibi for two main reasons. *Id.* at 692, 151 S.E.2d 608. First, the defendant's testimony "as to his whereabouts on the day [the victim] was cut [was] merely incidental to his denial that he cut [the victim.]" *Id.* Second, based on the evidence presented at trial, it was unknown the exact time the victim was cut. *Id.* "In view of this uncertainty, even if defendant's testimony as to his whereabouts [were] accepted as true, the jury might still have found that he" cut the victim. *Id.* Accordingly, an instruction on alibi was not necessary. *Id.*

In the present case, at the charge conference, Defendant requested that the trial court instruct the jury on alibi and tendered a written copy of the pattern jury instruction. The State objected on the ground that the evidence did not support such an instruction. The trial court agreed with the State's argument and declined to give the instruction.

Similar to *Green*, Defendant's alibi defense at trial rested entirely on Defendant's testimony that he did not injure Junior and that Defendant left Junior unattended in the bathtub for an extended period of time while Defendant was out of the apartment. Like *Green*, Defendant's testimony is "merely incidental to his denial" that he harmed Junior and is not sufficient to warrant an instruction on alibi. *Id.* Moreover, the fact that Defendant might have left Junior unattended in a bathtub for 20 minutes does not lead to the impossibility of his being the perpetrator, particularly since the precise timing of the incident was not determined, and Defendant had exclusive custody of Junior for several hours before his death. Defendant's testimony does not show "at the time the crime was committed he was at a particular place which would make it impossible for him to have committed the crime." *McLawhorn*, 270 N.C. at 630, 155 S.E.2d at 204. Therefore, "even if defendant's testimony as to his whereabouts [were] accepted as true, the jury might still have found that he" killed Junior. *Green*, 268 N.C. at 692, 151 S.E.2d at 608.

Accordingly, the trial court did not err by denying Defendant's requested instruction on alibi. Defendant's argument is overruled. We conclude that Defendant received a fair trial, free of error.

NO ERROR.

Judges STEELMAN and HUNTER, JR. concur.