STATE OF NORTH CAROLINA
v.
DAVID LARRY WILLIAMS, Defendant

No. COA12-1034

Filed 2 April 2013

1. **Stalking—continuous course of conduct—effective date of new statute**

    In a stalking prosecution for conduct that extended over the time in which a new statute was enacted, the trial court erred by not specifically instructing the jury that it must decide whether the State proved that defendant committed a criminal act after the date of enactment of the new statute beyond a reasonable doubt and render a special verdict as to that issue.

2. **Stalking—continuous course of conduct—new statute—instructions—plain error**

    A stalking conviction was vacated and remanded where there was plain error in the trial court's failure to instruct the jury to render a special verdict as to whether defendant's conduct extended beyond the enactment of the new stalking statute under which

defendant was indicted. Given the jury instructions and the verdict form, the Court of Appeals could not tell whether the jury convicted defendant on the basis of any post-enactment conduct, which implicated defendant's due process right to be free from retroactive judicial application of a criminal statute. Furthermore, because of the lack of evidence that defendant continued to stalk the victim after the effective date of the new statute, it could be said that the instructional mistake had a probable impact on the jury's finding.

**3. Domestic Violence—violation of protective order—presence at shopping center**

The evidence was insufficient to establish that defendant knowingly violated a domestic violence protective order (DVPO) and the trial court should have granted his motion to dismiss. Defendant was present during regular business hours at a public location with numerous stores other than the salon at which the victim was working that day. The salon had not been specifically noted on the DVPO and was not the victim's usual workplace. A reasonable deduction that defendant might *likely* violate the DVPO if he was in a large shopping center and he was aware that the victim was nearby is not the same as a reasonable inference that he did, in fact, knowingly violate the order. Even taken in the light most favorable to the State, the evidence here only raised a suspicion of guilt.

Appeal by defendant from judgments entered on or about 20 April 2011 by Judge Michael J. O'Foghludha in Superior Court, Wake County. Heard in the Court of Appeals 28 February 2013.

*Attorney General Roy A. Cooper, III by Assistant Attorney General Amanda P. Little, for the State.*

*Leslie C. Rawls, for defendant-appellant.*

STROUD, Judge.

David Larry Williams ("defendant") appeals from judgments entered on or about 20 April 2011 in Superior Court, Wake County. Defendant argues that the trial court committed plain error in its instructions to the jury as to the charge of stalking and that the trial court should have granted his motion to dismiss the charge of violating a domestic violence protective order because of insufficient evidence. For the following reasons, we agree.

## I. Introduction

Defendant was indicted on 20 April 2009 for one count of violating a domestic violence protective order and one count of felony stalking. The original stalking indictment tracked the language of N.C. Gen. Stat. § 14-277.3 (2007), which was repealed and replaced by a new stalking statute, N.C. Gen. Stat. § 14-277.3A (2009), effective 1 December 2008. On 4 January 2011, the stalking indictment was superseded by one tracking the new statutory language.

Defendant pleaded not guilty and the State proceeded to jury trial on both charges. At trial, the evidence tended to show that defendant began dating Tammy Smith[1] in August of 2008. They dated for approximately four to five weeks before Ms. Smith ended the relationship. Over the next several months, defendant repeatedly attempted to communicate with Ms. Smith, despite her express wishes to be left alone. On several occasions, he hid near a place he knew she would be and then attempted to talk to her when she appeared. In one instance, Ms. Smith was walking to her car in a shopping center when defendant came out of the nearby woods and tried talking to her. Ms. Smith screamed when she saw him and defendant ran off. On another night, defendant again approached Ms. Smith as she was leaving her apartment. She told him again to leave her alone. Despite her repeated attempts to rebuff defendant, defendant persisted in following, observing, and communicating with her.

After Ms. Smith attempted to procure a Domestic Violence Protective Order (DVPO), an unknown woman called her pretending to be from "victims' services." When Ms. Smith returned the call, defendant answered and said "gotcha." Ms. Smith testified that at one point, she even saw defendant attempting to climb up to her balcony on a ladder in the middle of the night. She testified that she moved to a different apartment because she was frightened by defendant's behavior to the point that she feared for her safety.

She and defendant signed, and the Wake County District Court entered, a consent DVPO on 18 November 2008. After that point, she no longer saw defendant, but her car and those of her friends and family were vandalized several times. Finally, on 21 January 2009, Mr. Smith, Ms. Smith's father, saw defendant at the parking deck at the North Hills shopping center. Ms. Smith worked as a receptionist for a chain of salons

---

1. To protect the identity and privacy of the victim, we will refer to her and her father by pseudonym.

in the Raleigh area. She primarily worked at a different location, but on 21 January she was working at the salon at North Hills. Although no one testified about the size or configuration of the shopping area, Mr. Smith testified that there was a hotel, a large retail store, and a variety of other establishments at North Hills.

At the close of the State's evidence, defendant moved to dismiss both charges. The trial court denied the motion and the jury returned verdicts of guilty as to both charges. Defendant was sentenced to 150 days in the Department of Adult Correction for the violation of a domestic violence protective order and a consecutive sentence of 39-47 months for the stalking conviction. Defendant did not give notice of appeal in open court. On 15 February 2012, defendant filed a petition for writ of certiorari with this Court. We granted defendant's petition by order entered 2 March 2012. Therefore, we have jurisdiction to consider defendant's appeal.

## II. Stalking Conviction

Defendant first argues that the trial court committed plain error by instructing the jury on the crime of stalking under N.C. Gen. Stat. § 14-277.3A (2009) when the bulk of the conduct constituting the offense was alleged to have taken place while the old stalking statute, N.C. Gen. Stat. § 14-277.3 (2007), was still in effect and the evidence failed to show that defendant continued to harass the victim after the new statute came into effect. Although our Supreme Court has addressed a similar *ex post facto* issue in the context of murder prosecutions, this case appears to be one of first impression in North Carolina. *See, e.g., State v. Detter*, 298 N.C. 604, 638, 260 S.E.2d 567, 590 (1979) (holding that for *ex post facto* purposes the law at the time of the murderous act applies, rather than the law at the time the victim perished). For the following reasons, we agree that the trial court erred in instructing the jury and that this error constitutes plain error. We therefore vacate defendant's conviction for stalking and remand for a new trial.

The trial court instructed the jury in accord with the superseding indictment, which tracked the language of N.C. Gen. Stat. § 14-277.3A. That indictment charged defendant with stalking under the new statute, alleging that from October 2008 to February 2009 defendant harassed Ms. Smith and "engaged in a course of conduct directed at [Ms. Smith], when the defendant knew or should have known that the harassment and course of conduct would cause a reasonable person to fear for the person's safety or safety of their immediate family and close personal associates or suffer substantial emotional distress by placing that person in fear of death, bodily injury or continued harassment."

STATE v. WILLIAMS

[226 N.C. App. 393 (2013)]

The crime of stalking requires proof of a continuing course of conduct. By definition, a single stalking offense consists of more than one act under the new statute, as it did under the old statute. *See* N.C. Gen. Stat. § 14-277.3 (2007); N.C. Gen. Stat. § 14-277.3A (2009). The new stalking statute came into effect on 1 December 2008. 2008 N.C. Sess. Laws ch. 167. Defendant argues that the evidence did not show that he either harassed or engaged in a course of conduct toward Ms. Smith after 1 December 2008 that could constitute stalking and therefore to instruct the jury using the 2008 amendments is imposition of the law *ex post facto.*

"The United States and North Carolina Constitutions prohibit *ex post facto* laws. U.S. Const. art. I, § 10, cl. 1; N.C. Const. art. I, § 16. . . . [T]he federal and state constitutional *ex post facto* provisions are evaluated under the same definition." *State v. Bowditch,* 364 N.C. 335, 341, 700 S.E.2d 1, 5 (2010) (citations and quotation marks omitted). "There are two critical elements to an *ex post facto* law: that it is applied to events occurring before its creation and that it disadvantages the accused that it affects." *State v. Barnes,* 345 N.C. 184, 234, 481 S.E.2d 44, 71 (1997) (citation omitted), *cert. denied,* 523 U.S. 1024, 140 L.Ed. 2d 473 (1998).

Defendant labels his argument an *ex post facto* challenge, but the issue he raises is more properly classified as one of due process. The prohibition of *ex post facto* laws only applies to "legislative enactments." *Id.* The statute here clearly states that the amendments to the stalking statute only apply to "offenses" committed after 1 December 2008. It is not a retroactive law, and therefore there is no true *ex post facto* issue. Nevertheless, "the Fifth and Fourteenth Amendments to the Constitution of the United States also forbid the retrospective application of an unforeseeable judicial modification of criminal law to the detriment of the defendant." *Id.* at 234, 481 S.E.2d at 71-72. This rule applies to jury instructions that permit the jury to erroneously apply a criminal statute retroactively. *See United States v. Marcus,* ___ U.S. ___, ___, 176 L.Ed. 2d 1012, 1019 (2010) ("[I]f the jury, which was not instructed about the [statute's] enactment date, erroneously convicted [the defendant] based exclusively on noncriminal, preenactment conduct, [the defendant] would have a valid due process claim."); *United States v. Marcus,* 628 F.3d 36, 38 n.1 (2d Cir. 2011) ("[The defendant's] claim is properly labeled a due process claim because the potential retroactive application of the [statute] to [his] conduct was the result of an erroneous jury instruction rather than an act of Congress.").[2]

---

2. "Decisions by the federal courts as to the construction and effect of the due process clause of the United States Constitution are binding on this Court . . . ." *McNeill v. Harnett County,* 327 N.C. 552, 563, 398 S.E.2d 475, 481 (1990). We may also refer to

The application of a criminal statute is not considered retroactive when the crime charged is a continuing course of conduct, such as conspiracy, that continued past the date of enactment, even if the course of conduct began before the enactment of that statute. *See United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) ("It is well-settled that when a statute is concerned with a continuing offense, the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of the statute." (citation and quotation marks omitted)), *cert. denied*, 529 U.S. 1077, 146 L.Ed. 2d 501 (2000); *People v. Grant*, 973 P.2d 72, 75 (Cal. 1999) ("In general, application of a law is retroactive only if it attaches new legal consequences to, or increases a party's liability for, an event, transaction, or conduct that was *completed* before the law's effective date." (citations omitted)); *People v. McDade*, 804 N.E.2d 714, 716 (Ill. App. Ct. 2004) (holding that a continuing course of conduct is not complete until the last act is accomplished and that if the last act of a continuing course of conduct occurs after a statutory enactment, that statute may be applied without violating the *ex post facto* prohibition, even if the course of conduct began prior to enactment).

But it would violate a defendant's due process rights to convict him solely on conduct that ended prior to a new statutory enactment. *See Marcus*, ___ U.S. at ___, 176 L.Ed. 2d at 1019. The United States Supreme Court has observed that proper jury instructions as to the timing of the offense and date of enactment would "minimize, if not eliminate," the risk of a due process violation. *Id.* The same logic holds true for modifications of criminal statutes "that . . . disadvantage[] the accused that it affects." *Barnes*, 345 N.C. at 234, 481 S.E.2d at 71; *see State v. Robinson*, 335 N.C. 146, 150, 436 S.E.2d 125, 128 (1993) ("If defendant is prosecuted for murder based on our abrogation of the 'year and a day' rule subsequent to the assault but prior to the time the victim died, he is deprived of a defense that was allowed by the law in effect at the time of his murderous acts, and consequently his conviction could be obtained on less evidence than required of the State at the time of those acts. Such retroactive application of judicial action deprives defendant of due process of law under the United States Constitution . . . .").

Here, the statutory modification lessened the burden on the State and disadvantaged defendant by requiring only that the State prove that defendant knew or should have known "that the harassment or course

opinions from other jurisdictions as persuasive authority. *See, e.g., State v. Pennington*, 327 N.C. 89, 100-01, 393 S.E.2d 847, 854 (1990) (considering appellate decisions from other states).

of conduct would" cause a reasonable person to fear for their safety or that of their "close associates" or cause that person substantial emotional distress by placing her "in fear of death, bodily injury, or continued harassment." N.C. Gen. Stat. § 14-277.3A. The prior version required that the State prove that defendant specifically intended the above result. N.C. Gen. Stat. § 14-277.3 (2007). "The word 'knowingly' . . . means that defendant knew what he was about to do, and, with such knowledge, proceeded to do the act charged." *State v. Aguilar-Ocampo*, ___ N.C. App. ___, ___, 724 S.E.2d 117, 125 (2012) (quoting *State v. Stephenson*, 218 N.C. 258, 264, 10 S.E.2d 819, 823 (1940)) (brackets omitted). If the statute requires specific intent, by contrast, "the State . . . must show that the defendant intended for his action to result in the" consequences outlined by the statute. *State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992).

Applying such a change retroactively would "permit his conviction upon less evidence than would have been required to convict him of that crime at the time [of the offense] . . . and would, for that reason, violate the principles preventing the application of *ex post facto* laws." *State v. Vance*, 328 N.C. 613, 622, 403 S.E.2d 495, 501 (1991) (citation omitted). "The change in the statute, therefore, can only be applied to a continuing offense if the illegal conduct continued into the period after enactment." *United States v. Williams-Davis*, 90 F.3d 490, 511 (D.C. Cir. 1996) (citations omitted), *cert. denied*, 519 U.S. 1128, 136 L.Ed. 2d 867 (1997); *see United States v. Fishman*, 645 F.3d 1175, 1195 (10th Cir. 2011) (holding that there was no plain error because there was evidence that the charged conspiracy continued post-enactment), *cert. denied*, ___ U.S. ___, 181 L.Ed. 2d 740 (2012); *Selsor v. Workman*, 644 F.3d 984, 1013 (10th Cir. 2011) (holding that "because the 1976 murder statute required fewer elements of proof than the 1973 murder statute, the state trial court's instructional error clearly had an *ex post facto* effect on Selsor" and violated his due process rights), *cert. denied*, ___ U.S. ___, 182 L.Ed. 2d 184 (2012).

The issue defendant raises here, however, is not whether his conviction violated his due process rights, but whether the trial court correctly instructed the jury in light of those due process concerns. "The prime purpose of a court's charge to the jury is the clarification of issues, the elimination of extraneous matters, and a declaration and an application of the law arising on the evidence." *State v. Smith*, 206 N.C. App. 404, 416, 696 S.E.2d 904, 911 (2010) (quoting *State v. Cameron*, 284 N.C. 165, 171, 200 S.E.2d 186, 191 (1973)).

Generally, in criminal prosecutions "time is not of the essence except where an alibi, the statute of limitations, or some other defense

predicated on time is involved." *State v. Partridge,* 66 N.C. App. 427, 429, 311 S.E.2d 53, 55, *disc. rev. denied,* 310 N.C. 629, 315 S.E.2d 695 (1984). Nevertheless, where, as here, a defendant is indicted for a continuing conduct offense that began prior to a statutory modification that disadvantages the defendant and the indictment tracks the new statute's disadvantageous language, "the question of whether the violation extended beyond the effective date of the statute is one that has to be resolved by the jury." *United States v. Munoz-Franco,* 487 F.3d 25, 55 (1st Cir. 2007) (quoting *United States v. Tykarsky,* 446 F.3d 458, 480 (3d Cir. 2006)) (brackets omitted), *cert. denied,* 552 U.S. 1042, 169 L.Ed.2d 514 (2007); *accord United States v. Julian,* 427 F.3d 471, 481-82 (7th Cir. 2005) ("[B]ecause the alleged conspiracy spanned two different versions of the statute with different maximum penalties, the question of whether the conspiracy extended beyond the effective date of the amended version was one that had to be resolved by the jury rather than the judge.").

The procedural mechanism of a special verdict is particularly apt for resolving such issues in a manner clear to all parties and to reviewing courts.

> A special verdict is a common law procedural device by which the jury may answer specific questions posed by the trial judge that are separate and distinct from the general verdict. Despite the fact that the General Statutes do not specifically authorize the use of special verdicts in criminal trials, it is well-settled under our common law that special verdicts are permissible in criminal cases.

> Special verdicts, however, are subject to certain limitations. After the United States Supreme Court decision in *United States v. Gaudin,* a special verdict in a criminal case must not be a "true" special verdict-one by which the jury only makes findings on the factual components of the essential elements alone-as this practice violates a criminal defendant's Sixth Amendment right to a jury trial. 515 U.S. 506, 511-15, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); Kate H. Nepveu, Beyond "Guilty" or "Not Guilty": Giving Special Verdicts in Criminal Jury Trials, 21 Yale L. & Pol'y Rev. 263, 263 (2003) [hereinafter Nepveu]; *cf.* N.C. R. Civ. P. 49(a) (allowing a "true" special verdict in civil cases, defining it as "that by which the jury finds the facts only."). Thus, trial courts using special verdicts in criminal cases must require juries to apply law to the facts they find, in some cases "straddl [ing] the line between facts and law"

as a "mini-verdict" of sorts. *See* Nepveu at 276 (noting the "most common and widely recognized" use of "special verdicts that combine facts and law" is in RICO and continuing criminal enterprise prosecutions).

Furthermore, requests for criminal special verdicts must require the jury to arrive at its decision using a "beyond a reasonable doubt" standard, since a lesser standard such as "preponderance of the evidence" would violate a defendant's right to a jury trial. Aside from these limitations, however, we are aware of no limits on our trial courts' broad discretion to utilize special verdicts in criminal cases when appropriate.

*State v. Blackwell*, 361 N.C. 41, 46-47, 638 S.E.2d 452, 456-57 (2006) (citations, quotation marks, and brackets omitted), *cert. denied*, 550 U.S. 948, 167 L.Ed. 2d 1114 (2007).

We have instructed our trial courts to use special verdicts to have the jury explicitly determine a specific issue of fact necessary for conviction, such as the location of the offense when jurisdiction is contested. *See, e.g., State v. Bright*, 131 N.C. App. 57, 62, 505 S.E.2d 317, 320 (1998) ("If the trial court preliminarily determines that sufficient evidence exists from which a jury could find beyond a reasonable doubt that the crime was committed in North Carolina, the court is obligated to instruct the jury that unless the State has satisfied it beyond a reasonable doubt that the crime occurred in North Carolina, a verdict of not guilty should be returned. The trial court should also instruct the jury that if it is not so satisfied, it must return a special verdict indicating a lack of jurisdiction. Failure to charge the jury in this manner is reversible error and warrants a new trial." (citations, quotation marks, and brackets omitted)), *disc. rev. dismissed as improvidently granted*, 350 N.C. 82, 511 S.E.2d 639 (1999).

Without a specific instruction on this issue, reviewing courts cannot discern whether the jury found that the State had proven any criminal acts post-enactment. *See Marcus*, ___ U.S. at ___, 176 L.Ed. 2d at 1019. Therefore, the trial court must specifically instruct the jury that they must decide whether the State has proven that the defendant committed a criminal act after the date of enactment beyond a reasonable doubt and render a special verdict as to that issue. We hold that the trial court's failure to so instruct the jury here was error.

We must now decide whether it was plain error. Under the plain error rule as articulated by our Supreme Court, we must "examine the entire record and determine if the instructional error had a probable

impact on the jury's finding of guilt." *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983) (citation omitted). If the jury probably convicted defendant solely on pre-enactment conduct, defendant's conviction must be vacated and we must remand for a new trial. *See Marcus*, 628 F.3d at 44 (after remand from the Supreme Court, vacating the defendant's conviction for sex trafficking because "the conduct supporting the sex trafficking charge differed materially before and after [the date of enactment], such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings."); *see also Mitchell*, 49 F.3d at 781 (concluding that there was no plain error where the evidence was such that there was no probability that the jury would have come to a different conclusion if instructed on timing).

Here, the State presented a great deal of evidence about defendant's actions before 1 December 2008. Ms. Smith testified that after about five weeks of dating, she broke up with defendant. Defendant persisted in calling her and Ms. Smith soon asked defendant to stop calling. Defendant continued calling Ms. Smith frequently even after she had asked him to stop. One night defendant called and asked Ms. Smith to meet for a drink. She told him no and ended up staying at a friend's house. The next day, Ms. Smith returned to her apartment and saw that it had been broken into, but that nothing had been stolen. At that point, Ms. Smith went to get a restraining order against defendant, but was not able to get him served until the end of November.

Sometime before the restraining order was served, but after the break-in, Ms. Smith was walking to her car in a shopping center when defendant came out of the nearby woods and tried to talk to her. Ms. Smith screamed when she saw him and defendant ran off. Around midnight on or about 9 October 2008, defendant came to Ms. Smith's apartment and knocked on her door. Around 2 a.m. the next morning, Ms. Smith woke up to clinking sounds on her balcony. She went over and saw that defendant had propped a ladder up to her balcony and was climbing up to the railing. Defendant ran away when Ms. Smith went to call the police. Because of these events, Ms. Smith feared for her life and would stay from time to time with friends and family.

Around 22 October, Ms. Smith received a call from a woman claiming to be from "Victims' Services." The next day, she called the number back, but defendant answered and said "Gotcha." Ms. Smith testified that she was scared and felt "violated" by this ruse. After this incident, Ms. Smith went to stay with her father. She had never taken defendant to her father's apartment, but one night when she went to the apartment

gym, defendant came out from where he was hiding under the stairs near the apartment and again tried talking to her. She told him, "Leave me alone, Larry, just leave me alone."

After the incident at her father's apartment, Ms. Smith decided to move to a new location. Only one or two days after she moved, Ms. Smith noticed a car behind her that seemed to be following her. She parked briefly, and then followed the car to see who had been following her. When she approached, she could see that defendant was driving the car. The next night around 10:45 p.m., defendant again approached Ms. Smith as she was leaving her apartment. She told him again to leave her alone. He responded, "Will you please come to my truck, I've got money in my truck for you, because I know it wasn't cheap moving into this apartment." When she refused, he called her "vulgar names."

Defendant was finally served with the *ex parte* temporary restraining order around 7 November 2008 and a consent DVPO was entered on 18 November 2008. After that point, Ms. Smith did not see or hear from defendant anymore, though various acts of vandalism continued to occur to her property and to that of her close friends and family. Ms. Smith's car and that of a friend were both "keyed". Someone scratched "FU" into the car of one of her friends. The above evidence shows multiple acts of harassment before 18 November 2008.

There was, by contrast, no evidence showing that defendant harassed, communicated with, followed, or observed the victim after 1 December 2008. The State concedes that most of the evidence involved acts prior to that date, but argues that there was some evidence of later criminal conduct. On 2 December, someone again "keyed" Ms. Smith's car. Someone then threw a rock through the window of her father's car. There was no evidence that defendant was in the vicinity of these vehicles when they were vandalized and there was no other evidence linking him to those incidents.

On 21 January 2009, Ms. Smith's father had come to escort his daughter to her car when she left work. As he was driving through the parking deck near the J.C. Penney's store, he saw defendant walking in the parking deck away from the shopping center. He watched defendant walk to his truck, get in, and drive away. He did not see defendant in the vicinity of the salon, nor was there any evidence that defendant attempted to observe or communicate with Ms. Smith that day. After Mr. Smith told Ms. Smith that he had seen defendant in the parking deck, she called the police to report his presence. Unlike the evidence of the prior incidents concerning defendant's presence in Ms. Smith's apartment complex,

there could be a number of innocent reasons for defendant to be present at the North Hills shopping area parking deck.

Around 25 January 2009, Mr. Smith discovered a GPS tracking device attached underneath the bumper of Ms. Smith's car. No physical evidence was taken from the scene that implicates defendant. The GPS tracking device had never been activated and the police were unable to determine who purchased it.

The evidence of post-enactment conduct is substantially weaker than the evidence about defendant's conduct prior to December. The only thing connecting the vandalism and GPS device to defendant is supposition and speculation based on his conduct before December. The only post-enactment evidence that directly implicates defendant was Mr. Smith's testimony that he saw defendant at the North Hills parking deck while Ms. Smith was working there on 21 January 2009. There was no evidence presented that defendant communicated with her in any way, that he was following her, or that he even was in a position to see her. In fact, she never would have been aware of his presence if her father had not seen him and informed her. The evidence only showed that defendant was seen walking to his car in a parking structure of a large public shopping center where Ms. Smith happened to be working in one of many nearby businesses on that particular day, and that she normally worked at a different location.

Although we are only considering whether the erroneous instruction had a probable impact on the jury's verdict, the sufficiency of the evidence analysis in *State v. Lee* is informative. In that case, the body of the defendant's wife was found "several miles from defendant's home in a clearing in the woods;" she had been shot twice. *State v. Lee*, 294 N.C. 299, 301, 240 S.E.2d 449, 450 (1978). "The State's evidence show[ed] that defendant probably beat the victim on two occasions just before her death, and it further show[ed] that defendant threatened to kill the victim a day or two before her death." *Id.* at 303, 240 S.E.2d at 451. The police were able to establish that the victim had been killed by a gun, but not the type or caliber. *Id.* at 300-01, 240 S.E.2d at 450. The defendant had been seen in possession of a gun the day after the victim was murdered. *Id.* at 302, 240 S.E.2d at 450. The defendant had even told someone that he was going to kill the victim. *Id.* at 301, 240 S.E.2d at 450. Nevertheless, our Supreme Court held that the evidence,

> considered in the light most favorable to the State, show[ed]
> that the defendant had the opportunity, means and perhaps
> the mental state to have committed this murder. Such facts,

> taken in the strongest view adverse to defendant, excite
> suspicion in the just mind that he is guilty, but such view is
> far from excluding the rational conclusion that some other
> unknown person may be the guilty party.

*Id.*

The evidence introduced here as to defendant's alleged actions after 1 December 2008 was far less substantial than that in *Lee*. Although several suspicious property crimes were committed against Ms. Smith and her associates, and the evidence showed that defendant had the "means and perhaps the mental state" to have committed these acts, there was no evidence connecting defendant to those events.

Defendant was indicted under the new N.C. Gen. Stat. § 14-277.3A. The new statute lessened the burden on the State by eliminating the requirement of proving specific intent and therefore disadvantaged defendant. The charged conduct straddled the date of enactment. Therefore, the trial court should have instructed the jury that they must find that defendant's continuing course of conduct included at least one predicate act of stalking after 1 December 2008 in order to convict him of stalking as charged, under the new statute. We only address the issue that is before us – whether the trial court erred in failing to instruct the jury as outlined above and whether that error probably impacted the jury's verdict. The sufficiency of the evidence as to this charge has not been raised by defendant and is not before us.

Given the jury instructions and the verdict form, we simply do not know whether the jury convicted defendant on the basis of any post-enactment conduct, which implicates defendant's due process right to be free from retroactive judicial application of a criminal statute. Further, because of the lack of evidence that defendant continued to harass, follow, observe, or attempt to communicate with Ms. Smith after 1 December 2008, "it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (citation and quotation marks omitted); *see Marcus*, 628 F.3d at 42-43 (concluding that there was no probability of a different outcome because there was sufficient evidence of post-enactment conduct and there was no discernible difference between the post-enactment and pre-enactment conduct). Accordingly, we vacate defendant's stalking conviction and remand for a new trial.[3]

---

3. We note that "[a] defendant waives his constitutional protection against double jeopardy when a verdict or judgment against him is set aside at his own instance either on

### III. Violation of Domestic Violence Protective Order

The next issue presented by defendant requires us to examine the semantics of the words to "stay away from" in detail. Defendant argues that the evidence was insufficient to establish that he knowingly violated the DVPO and that therefore the trial court should have granted his motion to dismiss as to this charge. We agree.

> The standard of review for a motion to dismiss is well known. A defendant's motion to dismiss should be denied if there is substantial evidence of: (1) each essential element of the offense charged, and (2) of defendant's being the perpetrator of the charged offense. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. The Court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve.

*State v. Teague*, ___ N.C. App. ___, ___, 715 S.E.2d 919, 923 (2011) (citation and quotation marks omitted), *disc. rev. denied*, ___ N.C. ___, 720 S.E.2d 684 (2012).

The elements of an offense under N.C. Gen. Stat. § 50B-4.1 are: (1) there was a valid domestic violence protective order, (2) the defendant violated that order, and (3) did so knowingly. *See* N.C. Gen. Stat. § 50B-4.1 (2008). "The word 'knowingly' . . . means that defendant knew what he was about to do, and, with such knowledge, proceeded to do the act charged." *Aguilar-Ocampo*, ___ N.C. App. at ___, 724 S.E.2d at 125 (quoting *State v. Stephenson*, 218 N.C. 258, 264, 10 S.E.2d 819, 823 (1940)) (brackets omitted).

The only instance in which defendant was alleged to have violated the DVPO was on 21 January 2009, when defendant went to North Hills. The indictment alleged that defendant violated the DVPO by "being outside the victim's place of work." To determine if defendant "knowingly"

---

motion in the lower court or on a successful appeal. This is also true where he merely asks that a judgment against him be vacated but the court goes beyond what he asks and orders a new trial. In such a case, the defendant may be tried anew on the same indictment for the same offense of which he was convicted, or he may be prosecuted on a new information charging the offense." *State v. Gainey*, 265 N.C. 437, 439, 144 S.E.2d 249, 251 (1965) (citations and quotation marks omitted).

violated the DVPO, we must first consider what the DVPO directed defendant not to do.

The 18 November 2008 DVPO was a consent order agreed to by defendant and Ms. Smith. The District Court found that

> On Oct. 2 2008, the defendant
>
> . . . .
>
> (c) placed in fear of continued harassment that rises to such a level as to inflict substantial emotional distress by . . . *confronting her in parking lot at Lynnwood Grill & calling her workplace on Oct. 14 at around 8 am to try to talk to her.*[4]

The District Court concluded that "defendant has committed acts of domestic violence against the plaintiff" and ordered as follows:

> 1. the defendant shall not assault, threaten, abuse, follow, harass (by telephone, visiting the home or workplace or other means interfere with the plaintiff.
>
> . . . .
>
> 7. the defendant shall stay away from the plaintiff's residence or any place where the plaintiff receives temporary shelter.
>
> . . . .
>
> 8. the defendant shall stay away from the following places:
>
> > (a)  the place where the plaintiff works
> >
> > . . . .
> >
> > (e)  Other: (name other places)
> >
> > *Lynnwood Grill on Glenwood Ave.*
>
> . . . .
>
> 14. Other: (specify).

---

4. The order was on a form, AOC-CV-306, Rev. 2/06. The printed language of the form is in regular type; the handwritten additions to the form are in italics.

*Defendant may go to Brier Creek Shopping Center (and stores restaurants therein), wild wings and Blinko's. The plaintiff will not enforce this order in those places.*

The DVPO did not identify Ms. Smith's workplace and did not require defendant to stay away from the North Hills shopping center or any specific distance away from any particular location or from Ms. Smith.

The State's claim that defendant violated the DVPO by "being outside" Ms. Smith's workplace could be interpreted as a violation of either paragraph 1 of the DVPO's decree requiring defendant not to "visit" her workplace or of paragraph 7, which required defendant to "stay away" from "the place where plaintiff works." Thus the State would be required to present evidence that defendant knowingly "visited" Ms. Smith's workplace or that he knowingly failed to "stay away" from "the place where [she] works." As the term "visit" implies a closer approach to the workplace than failure to "stay away" from the workplace, evidence that the defendant "visited" the workplace would seem to satisfy both, while evidence that defendant merely failed to "stay away" from the workplace would not necessarily mean that he "visited" it. In any event, the State does not argue that defendant "visited" Ms. Smith's workplace on 21 January 2009, only that he knowingly failed to "stay away" from it, so we will address this issue only.

Ms. Smith testified that she normally worked at the Stonehenge salon location, but that she would work at the North Hills location from time to time. On 21 January, she worked at Stonehenge from 8:30 a.m. until 4:30 p.m., then she worked at North Hills from 4:30 until 8:00 p.m. Her father came to escort Ms. Smith to her car when she got off work, and as he drove into the older part of the North Hills parking deck, behind J.C. Penney's, he saw defendant in the parking deck walking from the general direction of Ms. Smith's salon. Mr. Smith admitted that many other stores were also in that area. Mr. Smith did not testify that he saw defendant near Ms. Smith's workplace or her car, nor did he testify regarding the actual distance from the salon to the place where he saw defendant.

What does it mean to "stay away" from a workplace? Although this Court has differentiated between the phrase "stay away" and other similar phrases, we have not defined what the phrase means in the context of a DVPO. In *State v. Gilley*, in addressing a double jeopardy argument, we stated that an order directing the defendant to "stay away" from a residence was not the same as domestic criminal trespass, defined as "enter[ing] after being forbidden to do so or remain[ing] . . . upon the

premises occupied by a present or former spouse." *State v. Gilley*, 135 N.C. App. 519, 530, 522 S.E.2d 111, 118 (1999) (quoting N.C. Gen. Stat. § 14-134.3 (1993)), *disc. rev. denied*, 353 N.C. 528, 549 S.E.2d 860 (2001). In another case, *State v. Dye*, also addressing a double jeopardy argument, this Court noted that " 'stay' has been defined as 'to halt an advance; remain,' and the word 'away' as 'from this or that place[.]' " *State v. Dye*, 139 N.C. App. 148, 152, 532 S.E.2d 574, 577 (2000) (citations omitted). We then observed that "an order containing the directive to 'stay away' from a residence might arguably be violated by travel on a public street passing in front of the residence, or entry into the neighborhood or even the town wherein the residence is located." *Id.* We did not, however, purport to interpret the meaning of "stay away" for purposes of a DVPO. *Dye* only differentiated a "stay away" provision from an order directing the defendant to "not come to [a] residence," which we observed was the same as the prohibition of entering a location under the domestic criminal trespass statute; it did not define "stay away" for DVPOs generally. *Id.* at 153, 532 S.E.2d at 577-78. These cases indicate that "stay away" is different from both "do not enter" and "do not go to". Neither case, however, defined precisely what it means to stay away from a particular location. Given the ambiguity in "stay away," as noted in *Dye, see id.* at 152-53, 532 S.E.2d at 577, it is useful to consider the purpose of DVPOs.

Protective orders are intended to "restrain[] the defendant from further acts of domestic violence." N.C. Gen. Stat. § 50B-3 (2007). Under Chapter 50B, the court may

> [o]rder a party to refrain from doing any or all of the following:
>
> a.  Threatening, abusing, or following the other party.
>
> b.  Harassing the other party, including by telephone, visiting the home or workplace, or other means.
>
> c.  Otherwise interfering with the other party.

N.C. Gen. Stat. § 50B-3 (a)(9). Additionally, the court may "[i]nclude any additional prohibitions or requirements the court deems necessary to protect any party or any minor child." N.C. Gen. Stat. § 50B-3(a)(13).

Thus, where a court orders a defendant to "stay away" from a particular location, it does so to prevent the defendant from threatening, abusing, following, interfering with, or harassing the protected party. It is possible that a defendant may not actually set foot upon the workplace premises but could harass or interfere with a victim by lurking so near as to impede the victim's ability to travel from place to place—indeed,

defendant herein did just that several times prior to December 2008—but the area to "stay away" from is not without boundaries. We need not determine the precise contours of what it means to "stay away" because it is clear that there was insufficient evidence here that defendant failed to "stay away" from Ms. Smith's place of work, and no evidence that defendant *knowingly* did so.

The indictment alleges defendant was "outside" Ms. Smith's workplace, and although technically the area "outside" of Ms. Smith's workplace could include any place in the world outside the walls of the salon, obviously such an interpretation is absurd. Certainly the order must mean that defendant could not be so close to Ms. Smith's workplace that he would be able to observe her, speak to her, or intimidate her in any way, but we cannot define the exact parameters of the term "stay away." It is clear only that defendant was not seen in an area that could reasonably be described as "outside" of Ms. Smith's salon, nor was there evidence that he was in a location that would permit him to harass, communicate with, follow, or even observe Ms. Smith at her salon, which might reasonably constitute a failure to "stay away" from her place of work. There was also no evidence that he was in proximity to Ms. Smith's vehicle or that he was in a location which might be along the path she would take from the salon to her vehicle.

Additionally, there was no evidence that defendant was aware that Ms. Smith worked at the North Hills salon, or that he otherwise knew that he was supposed to stay away from North Hills. The order did not identify North Hills as one of the locations that defendant was supposed to stay away from. The order specified no distance that defendant was supposed to keep between himself and Ms. Smith or her workplace. Defendant was seen walking in the parking structure of a public mall at some unknown distance from the salon where Ms. Smith was working on the night in question.

The State argues that the jury could infer that defendant knew that Ms. Smith worked at other locations, including North Hills, from the fact that defendant dated Ms. Smith for four weeks and that defendant could have parked anywhere else around the shopping center. The State ignores the fact that there was no evidence that anyone ever told defendant that Ms. Smith worked at different salon locations or at the North Hills location specifically. The State also presented no evidence that defendant was otherwise aware of that fact. The DVPO itself gives no indication whatsoever that Ms. Smith's "workplace" varied or that it might be in North Hills. In fact, the only shopping area specifically mentioned in the DVPO is Brier Creek, and the order allowed defendant

to go to that area and to particular restaurants in that area. Neither the DVPO nor the evidence presented at trial reveals to us why the Brier Creek shopping center was mentioned specifically in the DVPO.

The State further argues that the "jury could have legitimately deduced that the likelihood of the defendant violating the protective order increased significantly . . . because of the potential of Ms. Smith leaving work and going to her car parked in the same parking lot as the defendant's around closing time." But there was no evidence that defendant went near Ms. Smith's parked car either. Although the evidence need not "point unerringly toward the defendant's guilt so as to exclude all other reasonable hypotheses," *State v. Steelman*, 62 N.C. App. 311, 313, 302 S.E.2d 637, 638 (1983) (citation omitted), it is well established that "[e]vidence which is sufficient only to raise a suspicion or conjecture of guilt is insufficient to withstand" a motion to dismiss. *Lee*, 294 N.C. at 302, 240 S.E.2d at 451. A reasonable deduction that defendant might *likely* violate the DVPO if he was in a large shopping center and he was aware that Ms. Smith was nearby is not the same as a reasonable inference that he did, in fact, knowingly violate the order.

Even taken in the light most favorable to the State, the evidence here only raises a suspicion of guilt and is inadequate for a reasonable mind to support the conclusion that defendant went to North Hills that night knowing that Ms. Smith was working there and that he failed to "stay away" from her place of work. This case is not one where the State presented evidence from which it could be reasonably inferred that defendant was aware the protected party was present and working at that location. Such knowledge cannot be inferred from the mere fact that he was present during regular business hours at a public location with numerous stores other than the salon that had not been specifically noted on the DVPO and was not Ms. Smith's usual workplace. Therefore, we reverse the trial court's order denying defendant's motion to dismiss the charge of violating the domestic violence protective order. As a result, we need not reach defendant's evidentiary arguments.

### IV. Conclusion

Instructing the jury based on the new stalking statute, which changes the *mens rea* required, without specifically instructing the jury on the date of enactment is error when the charged course of conduct occurred both before and after the enactment. Because the evidence of post-enactment conduct was significantly weaker than that of pre-enactment conduct, it is probable that the jury convicted defendant solely on the pre-enactment conduct. Therefore, failure to properly instruct the

jury here was plain error. Additionally, there was insufficient evidence to support defendant's conviction for violating the domestic violence protective order. We accordingly vacate defendant's conviction for stalking and remand for a new trial; we reverse the trial court's denial of defendant's motion to dismiss the violation of a protective order.

NEW TRIAL, in part; REVERSED, in part.

Judges STEPHENS and DILLON concur.