NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-1050                                           Appeals Court

COMMONWEALTH  vs.  ELISABETH TELCINORD.

No. 17-P-1050.

Norfolk.     February 7, 2018. - October 17, 2018.

Present:  Trainor, Blake, & Lemire, JJ.

Abuse Prevention.  Protective Order.  Practice, Criminal,
    Instructions to jury.  Arrest.  Words, "Stay away."

Complaint received and sworn to in the Quincy Division of
the District Court Department on August 5, 2016.

The case was heard by Mark S. Coven, J.

Meredith Shih for the defendant.
Marguerite T. Grant, Assistant District Attorney (Sean P.
Riley, Assistant District Attorney, also present) for the
Commonwealth.

TRAINOR, J.  After a jury trial in the Quincy Division of

the District Court Department, the defendant, Elisabeth

Telcinord, was convicted on a criminal complaint charging her

with one count of violating an abuse prevention order pursuant

to G. L. c. 209A, § 7.[1]  On appeal, the defendant argues that (1) there was insufficient evidence that she violated the stay-away provision of the order; (2) the judge's instruction to the jury to use their common understanding of the phrase "stay away from the plaintiff's residence" when the jury asked for a legal definition was error; and (3) testimony about the defendant's arrest created a substantial risk of a miscarriage of justice. We affirm the judgment.

On August 3, 2016, the Brockton Division of the District Court Department issued a G. L. c. 209A abuse prevention order directing the defendant to stay at least fifty yards away from the victim, not contact him, stay away from his workplace, and stay away from his residence located at 13 Hall Street in Randolph.[2]

At 8:15 P.M. on August 4, 2016, a Brockton police officer served the defendant with a copy of the c. 209A order in hand. At about 3 A.M. on August 5, 2016, a Randolph police officer was dispatched to Hall Street.  The officer drove on North Main

---

[1] The defendant was sentenced to one year of probation with the condition that she complete a batterer's program.

[2] The Commonwealth did not proceed against the defendant for a violation of the no-contact portion of the order.

Street, turned onto Hall Street, and parked his marked cruiser at 15 Hall Street.[3]

The officer observed two vehicles drive onto Hall Street from North Main Street. The first vehicle was driven by a man, later identified as the victim and the subject of the abuse prevention order. The second vehicle was operated by the defendant and was traveling about three car lengths behind the victim's vehicle. As the vehicles approached the cruiser, the defendant pulled her vehicle over to the right side of the street and stopped. The victim stopped his vehicle in front of the cruiser and got out to speak to the officer, who described the victim as "upset." The officer thereafter drove his cruiser back to the defendant's vehicle to speak with her.[4]

The defendant told the officer that "she thought that she was in compliance with the order by the distance she was away from the [victim's] house." She also said that she was married to the victim, and admitted that she was following him; she was trying to deal with a family issue involving the victim having contacted her father. The officer described the defendant as

---

[3] Hall Street is a residential street of mostly single-family homes. The street is not a "cut-through," and has minimal traffic -- "mostly people who live on the street."

[4] Based on the testimony and exhibits submitted at trial, we infer that the distance to the defendant's vehicle was very short. The officer presumably wanted to keep his cruiser close to him.

"upset." The officer spoke again with the victim, who was still upset, and then returned to the defendant's vehicle and arrested her. She identified herself by name, birthdate, and address at the booking.

Discussion. 1. Statutory framework. The Legislature enacted G. L. c. 209A in 1978. The original version of G. L. c. 209A, § 7, criminalized only a defendant's violation of an order to "refrain from abus[e]" or "vacate the household." See St. 1983, c. 678, § 5. In 1990, the Supreme Judicial Court considered the question whether a trial court judge's order requiring the defendant to "leave and remain away from the [marital household]" was authorized under the statute, because the statute, at that time, only contained the provision to "vacate forthwith the household." Commonwealth v. Gordon, 407 Mass. 340, 344-345 (1990). The defendant argued that the order could only be violated by failing to vacate the household, and not by his returning to visit it. Id. at 345-346. The court concluded that the defendant had misconstrued the purpose and scope of the term "vacate" as used in G. L. c. 209A.[5],[6] Id. at 346-348.

---

[5] The Legislature acted quickly and, in agreement with the court, enacted St. 1990, c. 403, § 2, which amended G. L. c. 209A, § 1, to define "vacate order" as a "court order to leave and remain away from the premises . . ." (emphasis added). General Laws c. 209A, § 3 (c), as amended by St. 1990, c. 403, § 3, allows the court to "[order] the defendant to vacate

The court proceeded to elaborate on the harm that the Legislature was attempting to prevent, and why it was essential that the defendant be required to stay away from the residence and workplace of the victim.

> "An order to 'vacate the household' . . . creates a haven for the abused party in which no further abuse need be feared and provides a temporary, partial separation of the abused and abusive party, thereby leaving fewer opportunities for abusive contact.

> "Were we to adopt the defendant's definition of 'vacate,' an abusive party, having surrendered occupancy of the household, would be free to return to the house at will. The abused party would have no ability to lessen the abusive party's prerogative to initiate contact and could expect no refuge from the possibility of further abuse. That the Legislature intended the word 'vacate' to include the concept of 'remain away' is demonstrated by the

---

forthwith and <u>remain away from</u> the household, multiple family dwelling, and workplace" (emphasis added).

[6] "In determining the range of activity the Legislature intended to prohibit by authorizing courts to issue orders requiring defendants to 'vacate' the marital home, this court must look to the words of the statute 'construed by the ordinary and approved usage of the language, considered in connection with the cause of [the statute's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished.' . . . Chapter 209A, while allowing an order to 'vacate,' provides no particular definition for the term. Webster's New Int'l Dictionary 2810 (2d ed. 1957) defines 'vacate' as '3. [t]o make vacant, as an office, post, house, etc.; to deprive of an incumbent or occupant.' While this definition makes clear the fact that the Legislature intended an abusive defendant to depart from the house, it provides no guidance in either a negative or affirmative direction whether the Legislature intended to require such a defendant to stay away from the house subsequent to the initial departure. The Legislature's intention, however, becomes clear when we consider the 'mischief or imperfection' with which c. 209A is concerned and 'the main object' which c. 209A seeks to accomplish." <u>Gordon</u>, 407 Mass. at 346.

> authority of a judge to issue a 'vacate' order for a period of one year. G. L. c. 209A, § 3 (b)."

Id. at 347.

The Gordon court read into the statutory language the requirement that the defendant not only vacate the residence but also remain away from it. The Legislature responded by amending the statute and making the court's interpretation explicit in the statutory language. See note 5, supra. The purpose of this interpretation, significantly, is the recognition of the core purpose of an abuse prevention order, that is, the creation and maintenance of a safe haven from the threat of continued abuse.

To establish a violation of G. L. c. 209A, § 7, the Commonwealth must prove that (1) a valid G. L. c. 209A order was issued by a judge, (2) the order was in effect on the date of the alleged violation, (3) the defendant had knowledge of the order, and (4) the defendant violated the order. See Commonwealth v. Collier, 427 Mass. 385, 388 (1998); Commonwealth v. Delaney, 425 Mass. 587, 595-597 (1997), cert. denied, 522 U.S. 1058 (1998). Only the fourth requirement is in dispute here, i.e., whether the defendant violated the order.

2. Stay away. The defendant argues that the phrase "stay away" is so vague that without the judge defining specific geographic boundaries for the meaning of "stay away," the jury

were allowed to speculate in reaching their decision on an
essential element of the crime.[7]

Our courts have not required this kind of mathematical
specificity in order to find a statute enforceable and a
defendant's due process rights protected.  In Commonwealth v.
Bohmer, 374 Mass. 368, 369 (1978), the Supreme Judicial Court
addressed a similar issue where the defendants challenged their
convictions of wilfully interrupting or disturbing a school in
violation of G. L. c. 272, § 40.[8]  The defendants contended that
the statute was unconstitutionally vague and therefore void, and
that their convictions under the statute were denials of their
right to due process under the Fourteenth Amendment to the
United States Constitution.  Id. at 371.  The court answered
their contentions while upholding the constitutionality of the
statute.

> "Due process requires that a criminal statute be
> sufficiently clear to give notice of the conduct that it
> prohibits.  A statute which either forbids or requires the
> doing of an act in terms so vague that men of common
> intelligence must necessarily guess at its meaning and

---

[7] The defendant's reliance on Commonwealth v. O'Shea, 41
Mass. App. Ct. 115, 118 (1996), overruled on other grounds,
Delaney, 425 Mass. at 597 n.9, is misplaced, as we do not agree
that it established the outer boundary of the meaning of "stay
away."

[8] General Laws c. 272, § 40, was rewritten by St. 2018,
c. 69, § 159, to prohibit the interrupting and disturbing of "an
assembly of people meeting for a lawful purpose."  This
amendment, however, does not affect the holding in the Bohmer
opinion.

differ as to its application, violates the first essential of due process of law. Due process requirements also mandate that no statute have such a standardless sweep that arbitrary and discriminatory enforcement by the police and the courts is permitted. It would certainly be dangerous if the [L]egislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.

"However, since words are the elements that constitute a statute, mathematical precision in the definition of legislative enactments is not required. A statute is satisfactory so long as it clearly indicates what it prohibits as a whole. . . . Uncertainty as to whether marginal offenses are included within the coverage of a statute does not render it unconstitutional if its scope is substantially clear." (Citations and quotations omitted.)

Id. at 371-372.

In Commonwealth v. Orlando, 371 Mass. 732, 733-736 (1977), the court previously addressed this principle when upholding the constitutionality of G. L. c. 272, § 53, which provides punishment for disturbers of the peace.[9]

"A law is unconstitutionally vague if it is not sufficiently explicit to give clear warning as to proscribed activities. Commonwealth v. A Juvenile, 368 Mass. 580, 586-587 (1975). Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). A law is not vague, however, if it requires a person to conform his conduct to an imprecise but comprehensible normative standard so that men of common intelligence will know its meaning. Broadrick v. Oklahoma, 413 U.S. 601, 608 (1973). Coates v. Cincinnati, 402 U.S. 611, 614 (1971). Moreover, even when the outer boundaries of a law are imprecise, such imprecision does not permit a facial attack on the entire law by one whose conduct 'falls squarely within the "hard core" of the [statute's] proscriptions,' [Broadrick,

---

[9] The statute "proscribes conduct which tends to annoy all good citizens and does in fact annoy anyone present not favoring it." Orlando, 371 Mass. at 734.

supra], <u>particularly if greater specificity in the law is impractical</u>." (Emphases added.)

<u>Id</u>. at 734.

Approximately fifty per cent of our country's State Legislatures have adopted the general "stay away" from a specified location provision in their domestic violence prevention statutes.[10] Various States use different phraseology for their general stay-away provisions but all result in the same prohibition. Arizona, for example, prohibits "coming near" the residence (or place of employment or school), Ariz. Rev. Stat. Ann. § 13-3602 (2018); Texas prohibits "going to or near the residence or place of employment," Tex. Fam. Code Ann. § 85.022(b)(3) (2017); Louisiana prohibits "going near the residence or place of employment," La. Rev. Stat. Ann. § 46:2135(A)(1) (2018); and Maine prohibits "[b]eing at or in the vicinity of" the plaintiff's residence, place of employment, or school. Me. Rev. Stat. Ann. tit. 19-A, § 4007(1)(C)(2) (2017).

---

[10] Those States requiring a specified distance have either specified a distance in the statute, left it entirely to the discretion of the judge, or both. Idaho and Montana, for example, specify that a defendant must stay 1,500 feet away from the plaintiff's residence or other specified location, or any other appropriate distance. See Idaho Code § 39-6306(1)(i) (2018); Mont. Code Ann. § 40-15-201(2)(d) (2017). Washington has upheld a one-mile stay-away order, see <u>State</u> v. <u>Chapman</u>, 140 Wash. 2d 436, 451, cert. denied, 531 U.S. 984 (2000); Wash. Rev. Code § 26.50.060(1)(c) (2018), while Kentucky has required that a stay-away order not exceed 500 feet. Ky. Rev. Stat. Ann. § 403.740(1)(a)(3) (2018).

States have interpreted the meaning of, and the parameters of, "stay away" from a fixed location. In State v. Williams, 226 N.C. App. 393, 408 (2013), the court distinguished between a domestic violence protective order prohibiting the defendant from visiting the protected person's workplace and a more general domestic violence protective order requiring the defendant to stay away from the protected person's workplace.

> "[W]here a court orders a defendant to 'stay away' from a particular location, it does so to prevent the defendant from threatening, abusing, following, interfering with, or harassing the protected party. It is possible that a defendant may not actually set foot upon the workplace premises but could harass or interfere with a victim by lurking so near as to impede the victim's ability to travel from place to place -- indeed, defendant herein did just that several times . . . -- but the area to 'stay away' from is not without boundaries. . . . The indictment alleges defendant was 'outside' [the protected person's] workplace, and although technically the area 'outside of [the protected person's] workplace could include any place in the world outside the walls of the salon, obviously such an interpretation is absurd. Certainly the order must mean that defendant could not be so close to [the protected person's] workplace that he would be able to observe her, speak to her, or intimidate her in any way, but we cannot define the exact parameters of the term 'stay away.'"

Id. at 409-410.[11,12]

---

[11] Notably, the defendant's conviction in Williams was reversed for a number of reasons, including that there was insufficient evidence to show that the defendant had violated the stay-away order or any of the order's purposes as discussed by the court. Williams, 226 N.C. App. at 411-412.

[12] In Residences at the Jewel, LLC vs. Tiedeman, Minn. Ct. App., No. C5-03-45 (Aug. 5, 2003) (unpublished decision), the court considered the question whether a defendant could be ordered to stay away from a location directly across the road from where he lived. The defendant argued that the stay-away

Our case law is replete with examples of upholding statutory language that is not precise but nevertheless "requires a person to conform his conduct to an imprecise but comprehensible normative standard so that men of common intelligence will know its meaning." Orlando, 371 Mass. at 734. For example, in Orlando, we applied a two-pronged test to define what is disruptive conduct pursuant to G. L. c. 272, § 53. See id. at 734-735. General Laws c. 272, § 53, prohibits conduct, "which, first, most people would find to be unreasonably disruptive, and second, [which] did in fact infringe on someone's right to be undisturbed. The first prong is normative and protects potential defendants from prosecutions based on

order was "vague and overbroad." He argued that because he lived directly across the road from the plaintiffs, it was "not feasible" for him to stay away, and claimed that he was "running the risk of contempt by simply staying in his home or, more seriously, every time he ventures out from his property onto [the road]." The court's answer to this alleged problem is an illustration of how a general stay-away order can be appropriately flexible when a specific distance would be inappropriate and unworkable.

> "As [the plaintiffs] assert, 'common sense dictates that
> the "stay away" language . . . does not apply to one who is
> in his own house, or to one who is simply using a public
> road to get to and from his own house.' [The defendant's]
> reading of the language is an unreasonable interpretation,
> in light of the fact that there is a county road between
> the [plaintiffs'] property and [the defendant's] home and
> those of his neighbors. [The defendant] continues to drive
> the road regularly and has encountered [the plaintiffs] in
> a civil manner since the order was issued. He has never
> been found in contempt. We conclude that the language
> 'stay away' is not overly broad or vague in this context."

unreasonable individual sensitivities.  The second prong

requires that the crime have a victim, and thus subjects

potential defendants to criminal prosecution only when their

activities have detrimental impact."  Id. at 735.

> "A more specific standard is impractical because the
> conduct proscribed by this law necessarily varies according
> to its location and timing. . . .  A disturbing the peace
> standard which attempted to define more precisely the
> levels of noise and types of conduct permitted in various
> places at varying times would be both underinclusive and
> overbroad.  The void for vagueness doctrine does not
> require this result.  Rather, for offenses such as this, it
> permits the use of a normative standard which informs a
> potential defendant that his common sense in most cases
> will define proscribed conduct" (emphasis added).[13]

Id.

---

[13] Similar statutes have withstood challenges for vagueness.
See Commonwealth v. Sullivan, 469 Mass. 621, 630 (2014), quoting
Commonwealth v. Reyes, 464 Mass. 245, 249 (2013) (addressing
accosting or annoying person of opposite sex in violation of
G. L. c. 272, § 53; "legislative language need not be afforded
'mathematical precision' in order to pass constitutional
muster'"); Commonwealth v. Daly, 90 Mass. App. Ct. 48, 51
(2016), quoting Orlando, 371 Mass. at 734 (animal cruelty
statute, G. L. c. 272, § 77, "sets forth a perhaps 'imprecise
but comprehensible normative standard'" which is sufficiently
exacting when viewed in context and in conjunction with case
law); Commonwealth v. Nee, 83 Mass. App. Ct. 441, 449-450 (2013)
(addressing common-law crime of affray; "person of common
intelligence would have little difficulty understanding" conduct
that law proscribes).  Similar analysis and results have
occurred regarding the interpretation of reckless endangerment
of a child under G. L. c. 265, § 13L, see Commonwealth v.
Figueroa, 83 Mass. App. Ct. 251, 265-266 (2013); open and gross
lewdness and lascivious behavior under G. L. c. 272, § 16, see
Commonwealth v. Coppinger, 86 Mass. App. Ct. 234, 235-239
(2014); and indecent assault and battery on a child under the
age of fourteen under G. L. c. 265, § 13B, see Commonwealth v.
Rosa, 62 Mass. App. Ct. 622, 626-627 (2004).

There certainly will be circumstances involving location and timing, within which a specific distance to stay away from a fixed location will be adequate to maintain a safe haven for the protected party. However, there are certainly also locations within which a general stay-away order is more appropriate to provide a safe haven for the protected party. The person ordered to stay away is required to conduct themselves so as not to contact or abuse the protected party.[14]

We do not think that the preferred practice should be to require the trial judge to determine a specific distance that the abuser must stay away from the protected person's residence or workplace. Rather, the decision whether to impose a specific distance, if any, should be left to the sound discretion of the trial judge, who is in the best position to determine what the

---

[14] A defendant in Pennsylvania challenged, for vagueness, the statute punishing the failure of a disorderly person to disperse upon official order. See Commonwealth v. DeFrancesco, 75 Pa. D. & C. 2d 502, 508 (1975). The defendant argued that he could not know "when he ha[d] satisfactorily dispersed." Id. The court held that adequate dispersal occurs "when he is no longer a threat to cause substantial harm, serious inconvenience, annoyance or alarm. The time and distance may vary under the particular circumstances surrounding the incident, but we believe that it is clear to any person of reasonable intelligence that he has not dispersed if he remains in a position that poses the threat and danger the statute seeks to prevent." Id.

circumstances require to create a safe haven for the protected party.[15]

Here, the defendant argues that the stay-away order could only be violated by her intruding onto the property of the victim's residence.[16] We reject this contention. When the defendant drove her vehicle onto Hall Street and parked near and in clear sight of the victim's residence at 3 A.M., it seems clear that she intended to confront the victim.[17] Her presence

---

[15] We consider, here, a judicial order requiring the defendant to "stay away from the plaintiff's residence." The statute, G. L. c. 209A, § 3 (c), allows the court to order the defendant "to vacate forthwith and remain away from the household." For the purpose of our construction of the legislative purpose of c. 209A, we perceive no difference between the terms "stay away from" and "remain away from." Both terms promote the core purpose of the abuse prevention order and the statute, to create and maintain a safe haven from the threat of continued abuse. See Gordon, 407 Mass. at 346-347.

[16] The defendant seems to be arguing that the stay-away order could only be violated by means of a criminal trespass. Such an argument fails simply because the Legislature has enacted two separate and distinct statutes, i.e., criminal trespass (G. L. c. 266, § 120) and abuse prevention (G. L. c. 209A, § 3), which serve to effectuate different purposes. See generally State v. Gilley, 135 N.C. App. 519, 527-530 (1999) (distinguishing between North Carolina's domestic criminal trespass statute and domestic violence protective order statute while analyzing double jeopardy clause).

[17] "While intent is an element of criminal contempt proceedings," G. L. c. 209A, § 7, has no such requirement. Delaney, 425 Mass. at 596. A conviction of violating an order issued pursuant to c. 209A requires proof "beyond a reasonable doubt that the defendant knew of the order. . . . Th[e] statute . . . requires no more knowledge than that the defendant knew of the order. We decline to read any additional mens rea requirements into the statute." Id. at 596-597. However, "[a]

on the victim's street near the victim's residence was not an accident, mistake, or otherwise the result of innocent conduct. This conduct violated the c. 209A order's directive to stay away from the victim's residence.

Next, the defendant argues that the judge committed reversible error when he provided the supplemental instruction in response to the jury's question regarding the "legal definition of stay away from the plaintiff's residence." Where, as here, the defendant failed to object to the instruction at trial, we review the instruction to determine whether any error in the instruction created "a substantial risk of a miscarriage of justice." Commonwealth v. Freeman, 352 Mass. 556, 564 (1967).

"The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly." Commonwealth v. Monteagudo, 427 Mass. 484, 488 (1998), quoting Commonwealth v. Waite, 422 Mass. 792, 807 n.11

---

long-standing common law principle requires that, in the absence of specific words saying so, it is not supposed that the [L]egislature intended to make accidents and mistakes crimes" (quotation omitted). Collier, 427 Mass. at 388. "The policies that are advanced by means of the remedies available under c. 209A do not require that restrained parties be convicted for what would generally be considered innocent activities. To hold otherwise would incorporate into the statute a concept of strict liability, and there is no basis for believing that this was the Legislature's purpose." Commonwealth v. Raymond, 54 Mass. App. Ct. 488, 493 (2002).

(1996).  Here, even if the instruction was error, it did not create a substantial risk of miscarriage of justice.

In the future, however, it would be better practice for the judge to explain to the jury what the stay-away order is intended to accomplish.  Such instruction would assist the jury in applying their common experience, in determining whether the defendant has violated the purpose of the order.  The distance will vary under different circumstances and can only be determined, as will a violation of the order, by what is necessary to prevent the defendant from contacting or abusing the protected party.[18]  The stay-away order is violated not only when a defendant actually commits an act of contacting or abusing the protected party, but also when the defendant is positioned within sufficient proximity to the property so that he would be able to contact or abuse the protected party if that party were on the property or entering or leaving it.  See Commonwealth v. Goldman, 94 Mass. App. Ct.   ,    (2018); Commonwealth v. Watson, 94 Mass. App. Ct.   ,    (2018).  The protected party need not be present for a violation of the order to occur.

3.  Arrest testimony.  Finally, we conclude that there is no merit in the defendant's contention that testimony about her

---

[18] Each of these prohibitions can be accomplished, under the circumstances, by the potential for physical, visual, or vocal contact.

arrest created a substantial risk of a miscarriage of justice. The police officer testified that he arrested the defendant, and that at the defendant's booking she gave her name, birthdate, and address.  The officer identified the defendant by comparing her appearance to her registry of motor vehicles photograph. See Commonwealth v. Crayton, 470 Mass. 228, 242 (2014) (identification testimony of arresting officer admissible to prove defendant "is the person who was arrested for the charged crime").  The defendant also attacked the adequacy of the police investigation, thereby placing her arrest at issue.  See Commonwealth v. Mitchell, 89 Mass. App. Ct. 13, 27 (2016); Commonwealth v. Philyaw, 55 Mass. App. Ct. 730, 733 (2002) ("officer should not be put in the false position of seeming just to have happened upon the scene," but should be allowed to explain conduct [quotation omitted]).  Finally, the judge's instructions would have countered any possible prejudice that could have flowed from evidence of the defendant's arrest.  The judge instructed the jury on the presumption of innocence on three separate occasions.  He specifically instructed that "[a] complaint against the defendant's [sic] only an accusation. It's not evidence."  There was no substantial risk of a miscarriage of justice here.

Judgment affirmed.